UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  08-20479-CR-UNGARO/SIMONTON

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RENOL MURAT,

     Defendant.

_____/

REPORT AND RECOMMENDATION

     This matter arose upon the Motion to Suppress Physical Evidence (DE # 28) filed by the defendant, Renol Murat.  The Honorable Ursula Ungaro, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE # 30).  The government has responded in opposition (DE # 33), and an evidentiary hearing was held on August 15, 2008.  The Defendant filed a post-hearing supplemental memorandum (DE # 36), and the government replied (DE # 38).  For the reasons set forth below, the undersigned respectfully RECOMMENDS that the Motion be DENIED.

    I.      INTRODUCTION

     Defendant Renol Murat is charged in a three-count Indictment with committing the following three offenses on or about May 7, 2008:  being a felon in possession of three specified firearms and various ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 1); possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 2); and possession of the firearms specified in Count 1 in furtherance of the drug trafficking crime specified in Count 2, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3) (DE # 13).

     The firearms and crack cocaine which form the basis for the above charges were

seized from Defendant Murat's apartment, which is Apartment # 116, at 13210 N.W. Memorial Highway, Miami, Florida, pursuant to a search warrant issued by a State of Florida Circuit Court judge.  The search warrant was issued based upon an anonymous tip coupled with the observations made by police officers when they approached Apt. # 116, knocked on the door, and were admitted into the apartment by Mr. Murat.

The presently pending Motion to Suppress challenges the legality of the entry into the apartment, and the use of the observations following the entry into the apartment for the purpose of obtaining a search warrant.  Specifically, the defendant contends that he was aroused from a deep sleep when the police knocked on the door of his apartment; that they demanded identification, and that when he told the police that his identification was in his bedroom and went to retrieve it, the police followed him inside without his voluntary consent to allow them to enter the apartment.  In the alternative, he contends that the scope of his consent was exceeded by the actions of the police which led to the challenged observations.  Defendant Murat does not challenge the sufficiency of the affidavit and search warrant other than as the fruit of the prior allegedly illegal entry.

The government contends that some of the observations were made prior to the entry into the apartment, and that the entry was made after Mr. Murat gave his consent. Thus, the government contends that the officers were permitted to use their observations of items in plain view when they entered the apartment in the affidavit which supported their application for a search warrant.  It was not clear from the government's response whether the government also contended that, even if the entry was illegal, the observations made prior to the entry into the apartment established probable cause for the issuance of the search warrant and/or exigent circumstances to justify the entry and a protective sweep of the apartment.  At the hearing, the

government clarified this, and argued that the smell of marijuana that emanated from the apartment when the door was opened, combined with an anonymous Crime Stopper's tip that drugs were being sold from that apartment, established probable cause to believe that illegal drugs were in the apartment, and gave rise to exigent circumstances which independently justified the entry into the apartment to secure the premises while a search warrant was obtained.

In reply, the defendant challenges the existence of probable cause and exigent circumstances to support the warrantless entry into his apartment.[1]

II.    FINDINGS OF FACT

At the evidentiary hearing, the government presented the testimony of Miami-Dade police detectives Harris Dowd, Carl Cooper, and Alex Eugene, and introduced into evidence various exhibits, including the search warrant and affidavit, as well as photographs of the apartment and the location of the items which the government contended were seen in plain view upon entry into the apartment.  The defense presented the testimony of Miami-Dade police detectives Jorge Yohay and Nelson Figueroa, as well as the testimony of the defendant's sister, Rita Murat, and introduced into evidence the property receipts which reflected the evidence seized by the police, and the consent to search form signed by Rita Murat with respect to her apartment.

Based upon consideration of the evidence as a whole, and for the reasons discussed in more detail below, the undersigned credits the testimony of the police detectives regarding the events that transpired on the morning of the search.  Although

---

[1]  Although obvious, the undersigned notes that the government has not challenged the defendant's reasonable expectation of privacy in the premises searched, which is the residence of the defendant.

there were minor inconsistencies in the testimony, this is to be expected among various witnesses, and the police detectives were consistent with respect to the material facts. The testimony of Rita Murat contradicted the police officers with respect to their entry into the defendant's apartment, as well as their actions with respect to her apartment, and was not consistent with common sense regarding how the events transpired.

On April 23, 2008, an anonymous tipster called Crime Stoppers and provided information concerning drug trafficking and weapons which led to this investigation. The tip was provided to Detective Yohay. On May 7, 2008, Detective Yohay met with other officers to brief them regarding this tip so that they could investigate the allegations. There were approximately seven or eight officers involved in this investigation.  The briefing took place at approximately 8:00 a.m. at a location near the apartment complex. Detective Yohay advised the other officers that according to the Crime Stopper's tip, apartments 102 and 116 were involved in narcotics sales and that there were guns in the apartments.  The briefing was informal, and there were no specific plans made regarding how the apartments would be approached.[2]  The officers went to the apartment complex, and parked in various locations around the complex.  They were all wearing police raid jackets over bullet proof vests, as well as their police badges and radios.  They were all armed with handguns which remained holstered at all times.

They arrived at approximately 8:20 a.m., and the officers either went to apartment 102 or 116.  Detective Harris Dowd approached apartment 116, accompanied by

_____

[2]  Although the tipster also stated that the occupants would refuse to consent to the police entering the apartments, this information was not communicated during the briefing.

Detectives Carl Cooper and Nelson Figueroa.[3]  Detective Cooper stood to the side of Detective Dowd, and slightly behind him; Detective Figueroa stood behind Detective Dowd.  Detective Dowd knocked on the door three or four times, waited a few seconds, and then again knocked three or four times and announced, "Police."  At that point, the defendant, wearing a white tank top and blue shorts, opened the door.  The time that elapsed between the start of the knocking and the opening of the door was less than two minutes.[4]  As soon as the door opened, Detective Dowd smelled a strong aroma of burnt marijuana.

Detective Dowd told the defendant they were the police, asked the defendant if he normally lived there, and the defendant responded that he did.  Detective Dowd asked if he had identification.[5]  The defendant said, "Yes, in the bedroom," and turned to go to the bedroom.  Detective Dowd then asked if they could go with the defendant.  The defendant responded, "Yes."  The defendant then walked through the living room area and into his bedroom, followed by Detective Dowd and Detective Figueroa.  No weapons were drawn, and Detective Dowd spoke to the defendant in a calm tone of voice.  The

---

[3]  The detectives testified consistently that there was no plan regarding which officers would approach apartment 102 and which would approach apartment 116. Detective Dowd testified that he went to apartment 116 because when he entered the apartment complex he saw that apartment first.  Detective Cooper testified that he went to apartment 116 because he saw that other officers were going to the other apartment.

[4]  Detective Dowd estimated that the time was about 20 seconds; Detective Cooper testified that it was two minutes "at most."

[5]  Detective Cooper testified that he recalled Detective Dowd identifying himself and advising the defendant of the nature of the investigation, but did not recall the exact words used.  Detective Dowd testified that he only said they were the police, and asked the defendant if he lived there, and asked for identification.  The undersigned credits the testimony of Detective Dowd that he did not specifically advise the defendant that they were conducting a narcotics investigation since Detective Cooper could not recall specifically what was said.

defendant appeared to understand Detective Dowd, was calm, and did not appear to be confused.

Based upon these events, the undersigned finds that the defendant voluntarily consented to the entry of the police officers into his apartment.[6]

Detective Figueroa and Detective Cooper both testified that they first smelled the odor of marijuana as soon as they entered the apartment, although they did not smell it when they were standing behind Detective Dowd.

When they entered the bedroom, the defendant reached under the bed to retrieve his identification.  At that time, Detective Dowd realized that there was a person sleeping in the bed.  Detective Dowd awakened that person, identified himself as a police officer, asked if he had a weapon, and asked for identification.  That person, whose name was Angy Antoine, stated that he did not have a weapon, and produced identification.

Detective Cooper followed Detectives Dowd and Figueroa into the apartment. Immediately upon entry, he smelled burnt marijuana, and also saw a bag containing what he believed to be packages of crack cocaine on a small table approximately ten to twelve feet from the door.[7]  Detective Cooper was able to recognize the packages as crack cocaine based upon his experience in hundreds of narcotics investigations–he had been assigned to the Major Narcotics section for 15 years, and had worked street narcotics cases for seven years prior to that.

---

[6]  As stated in more detail below, the undersigned specifically rejects the testimony of Rita Murat, the defendant's sister, concerning the circumstances under which the police first entered the defendant's apartment, *i.e.*, that the defendant attempted to close the door and that the police forced their way inside.

[7]  Neither Detective Dowd nor Detective Figueroa saw the cocaine when they entered the apartment.

Detective Cooper then walked to the table to observe the suspected crack cocaine more closely and confirm his initial observation.  The photographs reflect that as one enters the apartment and walks through the living room toward the bedroom, there is a couch on the back wall of the living room.  The bedroom is on the other side of this wall, and is entered by walking into a small hallway area and turning left into a doorway that is just past this wall (See GX 3).  The back wall of the living room contains the couch, which is placed next to the small hallway area, a chair, a small end table, and then a small folding table (See GX 6).  The crack cocaine was on the small folding table (See GX 6 and GX 7).

Detective Cooper confirmed that the drugs appeared to be crack cocaine, along with marijuana cigarette butts, and also saw two firearms inside an open closet next to the table on which the crack cocaine was located.[8]   At that time, Detective Cooper called out a signal to indicate what he had found.

At the same time, Detectives Dowd and Figueroa, were walking out of the bedroom with the defendant and Mr. Antoine.  Both the defendant and Mr. Antoine were then placed in handcuffs.  Detective Alex Eugene arrived at the apartment at this time. He heard someone say the police code which indicated that the subjects should be arrested.  The door to the apartment was open, and he saw the other detectives, who were inside and in the process of taking the defendant and Mr. Antoine into custody. Detective Eugene assisted them by placing the handcuffs on Mr. Antoine, while Detective

---

[8]  Photographs of the crack cocaine on the table, and the guns in the closet were introduced into evidence by the government at the hearing.  The photographs depicted the scene as it appeared to Detective Cooper, and were taken prior to the time that these items were moved.

7

Figueroa placed handcuffs on the defendant.[9]  Detective Dowd then returned to the bedroom to conduct a security sweep of the bedroom closet to ensure that nobody was hiding in the closet.

After placing handcuffs on Mr. Antoine, Detective Eugene conducted a security sweep of the kitchen area to ensure that there were no other persons present in the apartment.  He saw that there was a dropped ceiling in the kitchen, which appeared to be large enough to conceal a person.  He also saw a silhouette which appeared to be a rifle. He pushed the ceiling tiles up to look inside the space, and observed a rifle, which he left in place.  He told the other officers that there was a rifle in the ceiling, and then left.

Detective Jorge Yohay arrived at apartment 116 after the defendant had been handcuffed.  Detective Yohay had initially approached apartment 102, where the defendant's sister, Rita Murat resided.  As he approached apartment 102, he saw a young girl open the door, and leave it open.  He heard gospel music being played, and he saw Rita Murat standing in the living room.  When Detective Yohay approached, she lowered the music and came to the door.  Detective Yohay advised her that they had received a tip that there were drugs and guns inside her apartment.  Ms. Murat said that there was nothing there and that he could come inside.  Detective Yohay asked if she would sign a consent form to allow him to search the apartment, and she agreed.  She signed the form, and he conducted a search which revealed that there were no guns or

---

[9]  Detective Cooper testified that he called out the signal "52" which indicated that he had found drugs, and that he had not called out for the defendant to be arrested. Neither Detective Dowd nor Detective Figueroa could recall who gave the order to arrest the defendant, but each claimed he heard this order.  Detective Eugene, who arrived at the time the order was given, testified that he heard somebody call out a code "39," which is a code to arrest the subject, but he couldn't recall who said this.  Based upon all of the circumstances, the undersigned concludes that the other officers interpreted what Detective Cooper said as calling for the arrest of the defendant.

drugs inside the apartment.  The form reflects that it was signed at 8:20 a.m. (DX I).

When he finished searching apartment 102,[10] Detective Yohay went to apartment 116.  The defendant had already been handcuffed by the time that Detective Yohay arrived.  The drugs and guns were left where they were discovered, and apartment 116 was secured.  Detective Yohay then left the apartment and prepared an affidavit and search warrant to search apartment 116.

The affidavit used to support the search warrant contains the following facts:

> On April 23, 2008, Your Affiant received an anonymous crime
> stoppers tip advising that narcotic trafficking was occurring at
> 13210 Memorial Highway, apartment # 102 and # 116.  The
> tipster further advises that residents of apartment # 102 and #
> 116 are Haitian gang members and contain posses [sic]
> firearms.  On May 7, 2008 Your Affiant along with members of
> the Miami-Dade Police Department's Narcotics Bureau and the
> Intracoastal District Crime Suppression Team, responded to
> investigate the information that had been received.  A written
> consent to search was obtained for apartment # 102. The
> resident of apartment # 102 is Rita Murat, which is the sister of
> Travis, identified by the tipster as one of the gang members.
> The search did not discover any illegal narcotics or firearms.
> Simultaneously, contact was made with the residents at "The
> Premises."  Detective H. Dowd along with Detective C. Copper
> [sic] knocked on the front door.  Shortly thereafter a black male
> later to be known as Renol Murat (brother of Rita Murat)
> answered the door.  Detective H. Dowd identified himself to Mr.
> Murat as a police officer and explained the reason for his
> presence.  While Detective H. Dowd spoke with Mr. Murat a
> strong odor of marijuana was detected emanating from within
> "The Premises."   Detective Dowd asked Mr. Murat for his
> identification.  Mr. Murat informed Detective Dowd and Cooper
> that his identification was in the bedroom.  Mr. Murat verbally
> consented to the detective's following him into the bedroom.
> Prior to entering "The Premises" and from the doorway of the

---

[10]  As discussed *infra.*, the undersigned rejects the testimony of Ms. Murat that the detectives did not conduct a search of her apartment after obtaining written consent, and advised her that they believed that no drugs were in the apartment and that no search was necessary because she was playing gospel music and had young children in the apartment.

> "The Premises" Detective Cooper observed a clear plastic baggie containing crack cocaine on the small table located in the Dining/living room area.  As Detective Dowd walked in the bedroom he observed a black male later to be known as Angy Antoine lying on the bed, Detective Dowd requested identification from Mr. Antoine.  Mr. Antoine presented his identification and all parties walked out of the bedroom and into the living/dining room area. In the living/dining room area Mr. Murat and Antoine were arrested for cocaine possession. "The Premises" was secured.   During the securing of "The Premises" three firearms were discovered in plain view.

(Govt. Ex. 4 at 2-3).  Thereafter, the search warrant was issued by a state court judge. The search of the premises began shortly after 2:00 p.m.  The crack cocaine, marijuana, and firearms which were initially observed by Detective Cooper, as well as the rifle initially observed by Detective Eugene, were seized and impounded during the execution of the search warrant.[11]  Various other items were also seized, as reflected in the various property receipts introduced into evidence at the suppression hearing.

### The Testimony of the Defendant's Sister, Rita Murat

The defendant's sister, Rita Murat, testified in direct contradiction to the version of events recounted by the police officers concerning the circumstances of their entry into her brother's apartment.  For the reasons stated below, the undersigned finds that Ms. Murat was not a credible witness regarding these events.

---

[11]  Defense counsel impeached the testimony of the detectives that nothing was seized until the execution of the search warrant by pointing out that the items initially seen by Detectives Cooper and Eugene were listed on property receipts as having been impounded at 8:25 a.m.  Detective Yohay testified that this was a mistake since 8:25 a.m. was the time that they were first observed, but that they were not physically seized and impounded until the execution of the warrant.  The undersigned credits the testimony of Detective Yohay, which was corroborated by the testimony of all the other detectives.  In addition, the undersigned notes that the cocaine and guns were contraband and evidence in plain view, that (assuming the entry was lawful) could have been seized lawfully at the time the defendant was arrested.  *See, e.g. Horton v. California*, 496 U.S. 128 (1990).

Rita Murat testified that the police approached her apartment at approximately 7:00 a.m.[12] She identified three officers as being present at her apartment. She confirmed that her door was open at that time, and that she was playing gospel music. They asked if "Travis" was there, and she said that he did not live there. They told her that they had received information that drugs and guns were being sold out of her apartment. She told them that this was not true. She then claimed that one of the officers stated that since she was playing Christian music he was sure that she did not have any of that in her apartment. At that point, one of the officers asked if she would sign a consent to search form, and the other officer said that it was not necessary to search. Ms. Murat then testified that an officer asked her to sign the consent to search form to show his boss that he had conducted a search, but that it would not be necessary to actually search the apartment. Ms. Murat testified that she signed the form, and that the officers then left without conducting the search.

Ms. Murat testified that she followed the officer when he left her apartment, and saw him go to apartment 116, which was her brother's apartment. He then knocked on the door, and she saw her brother open the door. She could not hear what was said, but she saw her brother try to close the door and she saw the officer put his foot in the door to keep it from closing. She then saw approximately six officers push their way inside the apartment. As soon as they entered the apartment, they put handcuffs on her brother and his friend. The officers then began to search the apartment. Ms. Murat testified that she then went to school, and did not return until about 3:00 or 4:00 p.m.

---

[12] Although Ms. Murat testified that she believed the police approached her apartment at 7:00 a.m., the time next to her signature on the consent to search form, which was executed immediately after they approached her apartment, reflects that it was signed at 8:20 a.m.

that afternoon.  The officers were still present when she returned.  Her brother and his friend were sitting in the backseat of a Miami-Dade police car at that time.

The officers all testified that they approached both apartment 102 and apartment 116 at the same time.  The undersigned credits this testimony over the testimony of Ms. Murat that the officers approached her apartment first and then approached apartment 116 after they were finished speaking to her.  Based upon the nature of the investigation, it does not make sense that they would approach the apartments one at a time rather than dividing into two groups to approach the apartments simultaneously.  In addition, she testified that only three detectives approached her apartment; this leaves the other three or four detectives unaccounted for during this time.  It also does not make sense that the police would obtain a written consent for the search of her apartment and then choose not to conduct the search merely because she was playing gospel music and young children were present.  It would necessarily take some time for the police to speak to her and conduct a search of the apartment, and this is consistent with the testimony of Detective Yohay that he went to apartment 116 afterwards and saw that the defendant had already been taken into custody.  The testimony of all the detectives was consistent that Detective Yohay was not present when they first entered apartment 116.

Finally, the undersigned does not credit her testimony regarding the initial entry into the defendant's apartment since apartment 116 was entered at approximately the same time that the police approached her apartment.  Therefore, she was not in a position to see what initially occurred at her brother's apartment.[13]  In addition, her

---

[13]   The undersigned notes that the events she describes, which concern Detective Yohay's entry into the defendant's apartment, are more consistent with the actions taken after the crack cocaine was discovered and her brother and Mr. Antoine were handcuffed as they entered the living room area of the apartment.

demeanor on the witness stand was very nervous, and she rushed through her testimony.  She may be mis-recollecting what she observed rather than deliberately committing perjury; but either way her testimony is so far at odds with the testimony of the police detectives, common sense, and the circumstantial evidence of what occurred, that it is not credible.

III.   <u>LEGAL ANALYSIS</u>

A.   <u>Introduction</u>

The defendant challenges the search warrant issued in the case at bar on the grounds that it was based upon evidence obtained during an illegal entry into the defendant's apartment.  Specifically, the defendant contends that he was illegally seized after he opened the door to his apartment and the police asked to see his identification; and, that his consent for the police to enter the apartment while he retrieved his identification was not voluntary.  In his supplemental brief, the defendant argues that even if there was consent to the entry into his apartment, the actions of Detective Cooper in looking around his living room exceeded his consent, which was limited to permitting the officers to follow him into his bedroom.

In addition, the defendant asserts that since this was an investigation by state law enforcement officers, the lawfulness of their actions must be determined under state law.  Relying on *Smith v. State of Florida*, 904 So. 2d 534 (Fla. 1st Dist. Ct. App. 2005), the defendant contends that the smell of burnt marijuana alone does not establish probable cause for the search of a residence.

Thus, he claims that none of the observations of the police which were made after they entered the apartment could be used to support the issuance of the warrant, and that absent these observations the affidavit fails to establish probable cause.

B.    The Determination of Consent

`1. *Voluntariness*

The issue of whether the Defendant voluntarily consented to the entry of the detectives into his apartment is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Matlock*, 415 U.S. 164 (1974). In *Blake*, the Eleventh Circuit established the following factors to be used to assess the validity of a consent to search: the custodial status of the consenting party; the presence of coercive police procedures; the extent and level of the person's cooperation with the police; awareness of the right to refuse to consent to the search; intelligence and education, and the belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798. Although knowledge of the right to refuse to consent is a factor to be considered, it is only one factor to be considered under the totality of the circumstances, and the Supreme Court has expressly stated that there is no presumption of invalidity if the government fails to establish such knowledge, and that no "extra weight" is to be given "to the absence of this type of warning." *United States v. Drayton*, 536 U.S. 194, 206-07 (2002). The same factors are relevant to the determination, under the totality of the circumstances, of whether consent to enter the premises has been voluntarily given. However, the primary focus of the voluntariness determination in the context of consent to enter a residence, as opposed to consent to search, is whether the consent was prompted by a show of official authority.

Numerous cases have examined the voluntariness of consent. For example, in

*United States v. Ramirez-Chilel*, 289 F.3d 744, 747, 750-51 (11th Cir. 2002), the Court determined that consent to enter was voluntary despite fact that four agents approached defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit documents located inside the residence, and the defendant then "yield[ed] the right-of-way" to the officers" although he made no verbal response.  Similarly, in *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991), the Court rejected the argument that the defendant opened his door in response to "a show of official authority" where the agent and a backup officer, who were in plain clothes and had weapons which were not drawn, knocked continuously for three to four minutes and called out to the occupants requesting them to open the door.[14]

In holding that the consents given by the defendants in *Ramierz-Chilel and Tobin* were voluntary, the Court distinguished *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986), where the defendant's consent was not voluntary because it was prompted by a show of official authority.  In *Edmondson*, FBI agents investigating a bank robbery surrounded the defendant's apartment, drew their weapons, and knocked on the door, yelling, "FBI. Open the door."  Edmondson opened the door, stepped back and put

---

[14]  *See also United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (defendant's consent was voluntary despite prior protective sweep, fact that defendant was arrested outside his house and brought inside in handcuffs, the presence of 14 armed agents, and the defendant's initial refusal to consent to the search of the entire premises, where the agents advised the defendant of his rights, and did not threaten the defendant, but merely stated that if he did not consent to search of entire house they would secure the premises and attempt to obtain a search warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (consent was voluntary where defendant had been stopped at gunpoint, frisked, placed face down on the road, since officers spoke in conversational tone, had reholstered their weapons, did not threaten defendant, and defendant was not handcuffed); *United States v. Juarez*, 573 F.2d 267, 273-74 (5th Cir. 1978) (response of "That's fine" to DEA Agent's statement, "Well, I am going to have to search you," was a valid consent under the totality of the circumstances, including the fact that defendant was given *Miranda* warnings, and was a criminal defense attorney).

his hands on his head, thereby submitting to an arrest.  Under these circumstances, the

Court held that these actions did not constitute consent for the agents to enter the

apartment, but were only "an acquiesence to a show of official authority."  *Id.* at 1515.

Similarly, in *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995), the

Eleventh Circuit ruled as a matter of law that the defendant's consent to search was not

voluntary.  The Court described the relevant facts as follows:

> The circumstances of the entry to Tovar's apartment are summed up by the magistrate judge as follows: "Defendant was first confronted by police officers that day when at least five officers knocked loudly at her door, announced their identity as police officers through the closed door, and requested permission to enter.  Defendant then opened the door and the officers entered quickly with guns drawn to do the protective sweep."  He concluded that under these circumstances, the defendant did not have any understanding of her right to refuse entry and demand a warrant.
>
> A protective sweep was conducted while Tovar was seated at the dining room table.  She appeared to be calm.  The officers entered each room.  After this was completed, [an officer] asked Tovar for permission to again search the entire apartment because he thought that nothing had been found and no other people were in the apartment.  He told Tovar that she did not have to permit the further search, but if she did not, the agents would come back with a search warrant.  Tovar told the agents that she had just recently arrived and that she did not know what was going on.  She agreed to the search and signed a written consent form.  The magistrate judge found the consent involuntary.  He opined that Tovar had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search.  We agree.  We entertain no doubt that Tovar opened the door in response to a "show of official authority" and cannot be deemed to have consented to the agents' entry or to have voluntarily consented to the search. . . . "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that is was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."  *Florida v. Royer*, 460 U.S. 491, 497 (1983).

*Id.* at 1535-36.

Likewise, in *United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996), the Eleventh Circuit held that a Deputy United States Marshal had entered a residence without consent and in violation of the Fourth Amendment, when he followed the owner of the residence into the house.  In that case, two deputies had approached the owner of the residence regarding their investigation of the location of a fugitive and requested that she consent to their search of that residence.  The owner stated that she wanted to go inside to get a drink of water.  One of the deputies told the owner that he wanted to go in the house with her.  When she didn't bar him from entering, he followed her and continued to solicit her consent, explaining that the officers wanted to search for items belonging to the fugitive.  He also advised her that she had the right to refuse consent.  She then consented to the search, both orally and in writing.

The Eleventh Circuit held first that the initial entry was illegal, emphasizing that the failure to object to the entry cannot be deemed to be consent.  "[T]he government may not show consent to enter from the defendant's failure to object to the entry.   To do so would be to justify entry by consent and consent by entry."  71 F.3d at 830, *quoting United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990).  In this regard, the Court noted that "[e]ven though no 'fruits' were obtained from that [initial] entry, this is no way impacts upon the Fourth Amendment violation that accompanied Deputy Marshal McDermott's warrantless entry.  As the Supreme Court has explained, 'the reason why an officer might enter a house ... is wholly irrelevant to the threshold question whether the Fourth Amendment applies.... [The Fourth Amendment] would be no less transgressed if the [entry into] the house was undertaken to collect evidence ... or on a whim, for no reason at all.'  *Soldal v. Cook County*, 506 U.S. 56, 69 (1992)."  71 F.3d at

17

**829 n. 21.**

Turning to the totality of the circumstances present in the case at bar, the undersigned concludes that the facts in this case are similar to *Ramirez-Chilel* and *Tobin*. The government has proven that the defendant voluntarily consented to the entry of the detectives into his apartment, and that he did not merely acquiesce to a show of official authority.  The most significant facts are that the defendant was approached by detectives who did not have their weapons drawn, at a time in the morning when people are typically getting ready to go to work or school, there was no command given, the discussion was conducted in a calm tone of voice, and the defendant expressly agreed to let the police enter.   The conclusion that the consent to enter was voluntary is supported by a specific examination of the factors identified by the Eleventh Circuit in *Blake, supra*.

(1) The custodial status of the defendant.  The undersigned rejects the argument by defense counsel that the defendant was effectively seized and in custody at the time he gave consent.  Although Detective Dowd identified himself as a police officer, the defendant's movements were not restricted in any way–the defendant was not stopped when he turned away from the door and started to go to the bedroom; rather, Detective Dowd merely asked if the officers could go with him. This factor militates in favor of voluntariness.

(2)  The presence of coercive police procedures.  The police procedures were not coercive.  There was only brief knocking on the door, accompanied by an announcement that it was the police, before the defendant opened the door.  As stated above, there was no command given to open the door, there were no weapons drawn, the tone of voice was calm, there were no physical or verbal threats, and the approach was in the

18

morning, at a time when people are typically getting ready to go to work or school, rather than in the middle of the night, which is inherently more coercive.  Although there were three officers present, which is somewhat coercive, none of them had their weapons drawn, and two of them remained behind Detective Dowd, and only Detective Dowd spoke to the defendant.  This factor also militates in favor of voluntariness.

(3) The extent and level of the person's cooperation with the police.   The Defendant was calm and cooperative.  He immediately turned to retrieve his identification when asked if he had identification.  When Detective Dowd asked if they could go with him, the responded, "Yes," and then calmly proceeded to go into his bedroom.  This factor militates in favor of voluntariness.

(4) The awareness of the right to refuse to consent to the search.  The Defendant was not advised of his right to refuse to consent to the search.  This factor militates against a finding of voluntariness.

(5) The intelligence and education of the Defendant.   The only evidence concerning the defendant's mental status at the time is that he appeared to be calm and appeared to understand what Detective Dowd was saying.  There is no evidence in the record regarding the intelligence and education of the Defendant.  According to the property receipts that were introduced into evidence by the defense, the defendant was born in 1978, and was almost thirty years old at the time of the search.  Based upon the lack of evidence concerning the Defendant's intelligence and education, this factor is essentially neutral.

(6) The belief that no incriminating evidence will be found.   There is no direct evidence regarding whether the defendant believed that incriminating evidence would be found.  On the one hand, the crack cocaine was in plain view on a table in the living

room, and could be seen from the doorway once the apartment was entered.  On the other hand, neither Detective Dowd nor Detective Figueroa noticed the crack cocaine as they followed the defendant toward the bedroom.  Thus, the undersigned concludes that this factor is essentially neutral.

Based upon the express consent to enter the apartment and accompany the Defendant while he retrieved his identification from the bedroom, and the above factors, the undersigned concludes that his consent was voluntarily given, and not merely acquiescence to a show of official authority.

### 2.  *The Scope of the Consent*

At the conclusion of the hearing, and in his supplemental Memorandum (DE # 36), the defendant argues that even if the Court finds that he consented to the entry of the detectives into his apartment, the scope of the consent was limited to letting them accompany him to retrieve his identification from the bedroom, and did not extend to permitting Detective Cooper to linger behind and look around the living room area.  The defendant has not cited any cases to support this position, but it is well settled that the scope of consent is limited by the terms of the actual consent, and the government is not permitted to exceed the bounds of that consent.   Moreover, where there is a general statement of consent without any express limitations, the scope of the permissible search is limited to what a police officer could reasonably interpret the consent to encompass.  *Florida v. Jimeno*, 500 U.S. 248 (1991); *United States v. Martinez*, 949 .2d 1117, 1119-21 (11th Cir. 1992).

In the case at bar, the defendant clearly gave consent for the police to follow him into his bedroom where he went to retrieve his identification.  Based upon the testimony of the detectives, corroborated by the photographs introduced into evidence, the

20

defendant's apartment was very small, and it was necessary to go through the living

room area to reach the bedroom.  According to the credible testimony of Detective

Cooper, the packages of crack cocaine were visible on a table located approximately ten

to twelve feet from the front door, as depicted in GX 11.  Detective Cooper was permitted

by the terms of the consent to enter the residence and walk through the living room

area–he was not required to avert his eyes.  Thus, it was reasonable for him to look

around when he entered the residence, and when he did so he observed the crack

cocaine in plain view.[15]  In addition, the closet door next to the table was wide open, with

two firearms plainly visible on a shelf inside the closet.  There was no general

rummaging through closed spaces, under furniture, or through the contents of the

apartment prior to the sight of the crack cocaine and the two firearms in the closet.  The

undersigned agrees that the defendant did not permit a search of his entire apartment by

consenting to the entry of the officers; however, his consent did permit them to make

---

[15]  Even assuming that the scope of the consent did not include walking to the
area of the living room where the table was located, once Detective Cooper observed the
crack cocaine in plain view, exigent circumstances arose which permitted him to walk
over to it and either seize the contraband, or maintain the status quo until a warrant was
obtained.  *Horton v.* California, 496 U.S. 128, 136-37 (1990); *United States v. Rodgers*, 924
F.2d 219, 222-23 (11th Cir. 1991). The undersigned credits the testimony of Detective
Cooper that based upon his many years of experience as a narcotics detective, as soon
as he entered the apartment he was able to recognize the crack cocaine based upon its
appearance and packaging, which is depicted in GX 6 and GX 7.  The fact that he sought
to confirm this by making a closer inspection does not detract from the finding that he
had probable cause to believe that the substance was crack cocaine as soon as he saw
it.  The defendant has not argued that if Detective Cooper was lawfully inside the
apartment and observed crack cocaine from a place he had the right to be, that the
further actions and observations, including the protective sweep, were unlawful.
Rather, the defendant has argued that Detective Cooper did not have the right to "peer
around the living room area" and thus was not acting within the scope of the consent
when he made his observations (DE # 36 at 1-2). The undersigned has rejected the
factual contention relied upon by the defendant that Detective Cooper did not observe
the crack cocaine until he walked over to the table–finding instead that he recognized it
as soon as he entered the apartment.

observations inside the apartment once they entered and followed him into the bedroom. In addition, based upon an examination of the photographs of the small apartment, it was reasonable for the police to assume that this consent encompassed the living room area which was a small area adjacent to the bedroom.  The consent was given for all three officers to enter the apartment while the defendant retrieved his identification documents from the bedroom, and based upon the size of the apartment, it was reasonable for Detective Cooper to remain in the living room area while Detectives Dowd and Figueroa went into the bedroom to retrieve his identification.

In sum, the request was for all the detectives to come inside, the consent that was given included all three of the detectives, and it included permitting them to make observations of items in plain view in the living room area.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  *Accord Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (police are not required to avert their eyes).  Thus, the first requirement is that the object be viewed from a location where the police have a right to be; the second requirement is that the incriminating character be immediately apparent; and, the third requirement is that the police have the right to access to the place where the object is located.  As explained by the Court in *United States v. Rodgers*, 924 F.2d 219, 222-23 (11th Cir. 1991), where contraband is viewed from outside a residence, the third requirement is met and police are permitted to enter that residence to seize the contraband, if there are exigent circumstances.  Thus, when there is danger that evidence seen inside a residence may be destroyed or removed before a warrant can be

obtained, the police are permitted to enter the residence and seize the contraband.  *Id.*

In the case at bar, once Detective Cooper observed crack cocaine in plain view, it was reasonable to believe that if it was not secured, it would be removed or destroyed.[16]

C.     The Determination of Probable Cause Prior to the Entry Into the Apartment

In the alternative, and for the reasons discussed below, the undersigned concludes that even if the defendant's consent to entry was not valid, the detectives were nevertheless permitted to enter the residence based upon the information contained in the Crime Stopper's tip combined with the smell of burnt marijuana that emanated from the apartment when the door was opened.  As explained below, these facts rose to the level of probable cause to believe that illegal drugs were present in the apartment and created exigent circumstances to enter the apartment.

In *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983), the United States Supreme Court held that a determination of probable cause must be based an evaluation of the totality of the circumstances, and set forth the following guidance:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception."  *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id., at 175.

The Court then provided the following standards to apply when determining the existence of probable cause:

> " '[T]he term "probable cause,"  . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion.' [Locke v. United States, 7 Cranch 339, 348 [11 U.S.

---

[16]  This is not a case where the police created the exigency; rather, the police did not have probable cause to believe contraband was present in the apartment until after the defendant opened the door and was aware of their presence.

339, 348, 3 L.Ed. 2d 364] (1813).]... Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision.

. . . .

"The task . . . is simply to make a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."

462 U.S. at 235, 238-239.  In deciding whether probable cause exists, the court may examine the collective knowledge of law enforcement officers involved in the investigation.  *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

Numerous cases have held that the smell of marijuana or other drugs is sufficient to establish probable cause.[17]  Initially, it is well-settled that the alert of a narcotics-trained canine is sufficient to establish probable cause.  *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003);  *Hearn v. Board of Public Education*, 191 F.3d 1329, 1333 (11th Cir. 1999);  *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993);  *United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990);  *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984).  Similarly, human detection of the odor of marijuana has been deemed sufficient to establish probable cause (as well as exigent circumstances justifying a warrantless entry or search, where the subjects were aware of the detection).  *See, e.g.*,

---

[17] The defendant contends that state law governs this determination since the officers were state law enforcement officers investigating state offenses.  However, the issue in this case is whether the actions of the officers violated the constitutional protections afforded by the Fourth Amendment, which is a determination made under federal law.  *See Virginia v. Moore*, 128 S. Ct. 1598 (2008) (evidence seized incident to an arrest that was made in violation of state law is not excluded as fruit of the poisonous tree under the Fourth Amendment exclusionary rule, as long as the arrest did not also violation the Fourth Amendment; arrest for misdemeanor traffic arrest did not violate the Fourth Amendment even though state law required the issuance of a summons and was not an arrestable offense, therefore cocaine seized as incident to this arrest was admissible).

*Hardy v. Broward County Sheriff's Office*, 238 Fed. Appx. 435, 441 (11th Cir. 2007) (noting that under Florida law, possession of cannabis is either a misdemeanor or felony depending on the amount, and concluding that odor of "burnt cannabis" emanating from partially open door of apartment gave rise to "probable cause to believe that someone inside the apartment had been smoking cannabis and that this cannabis could be found somewhere inside the apartment" and that "had the Deputies delayed entering the apartment, they risked the 'loss, destruction, removal, or concealment of evidence' of this suspected crime, thereby creating exigent circumstances."); *United States v. Floyd*, 247 Fed. Appx. 161 (11th Cir. 2007) (smell of burning marijuana that emanated from house when defendant opened the door, combined with information from a confidential informant that defendant was a substantial drug dealer, established probable cause to believe that search of house would reveal evidence of a crime, and created exigent circumstances to enter the house); *United States v. Cephas*, 254 F.3d 488, 494-96 (4th Cir. 2001) (police lawfully approached apartment and knocked on door, based on a tip that young girl was smoking marijuana inside the apartment; when the door opened, the odor of marijuana coming from apartment and observation of young girl inside the apartment established probable cause and exigent circumstances to enter apartment), *citing United States v. Grissett*, 925 F.2d 776 (4th Cir. 1991) (odor of marijuana coming from a motel room provided exigent circumstances to justify a warrantless entry); *United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (DEA agent's "detection of an odor of marijuana was sufficient alone for a finding of probable cause" to support warrant to search luggage from which the odor emanated, regardless of reliability of canine alert; but affidavit also included information that carrier of the luggage was a documented drug violator and domestic drug courier, and an anonymous tip indicated

25

that marijuana was being transported from airport at which carrier departed); *United States v. Gorthy*, 550 F.2d 1051, 1052 (5th Cir. 1977) (odor of marijuana emanating from living quarters of motor home constituted probable cause for search).  *See also United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (observations of furtive activities, and movement of clear plastic bags containing smaller bundles from a car into a garage rose to the level of probable cause when law enforcement agent smelled marijuana after the door to the house was opened; and danger that someone might destroy this evidence created exigent circumstances to enter the house).

In the case at bar, the odor of burnt marijuana was coupled with a tip that the apartment was involved in narcotics sales.  Under the above cases, this is sufficient to establish probable cause to believe that illegal drugs were present inside the apartment; as well as exigent circumstances to support the entry based upon the risk of destruction of the contraband if steps were not taken to secure it.

Even assuming that state law was relevant to this determination, the case upon which the defendant relies does not alter this result. In *Smith v. State of Florida*, 904 So. 2d 534 (Fla. Dist. Ct. App. 2005), the police received a tip that the defendant was growing marijuana inside his home.  They obtained consent to enter the home, but noticed nothing unusual until the defendant's girlfriend walked by.  At that time, the police detected the odor of burnt marijuana on her person.  The Court held that the detection of this odor on her person did not provide probable cause to believe that there were drugs inside the house.  In reaching this result, the Court noted that probable cause was limited to the location of the "plain smell."  *Id.* at 537 and n. 5.  Thus, the Court distinguished cases in which probable cause was established to search locations from

which the smell emanated, such as vehicles.[18]  In the case at bar, however, the police detected the odor of burnt marijuana coming from the residence, rather than solely from a person who happened to be inside the residence.  Thus, even under the rationale of *Smith*, the police in the case at bar had probable cause to support the entry into and search of the defendant's apartment.[19]

IV.    **CONCLUSIONS OF LAW**

In summary, in accordance with the above findings of fact and legal analysis, the undersigned makes the following conclusions of law:

1.  The Defendant voluntarily opened the door to his apartment in response to the police knocking on the door.

2.  The odor of marijuana which emanated from the apartment when the door was opened, combined with the anonymous tip, established probable cause to believe that there were illegal drugs inside the apartment.

3.   The Defendant was not in custody at the time the police asked for consent to enter his residence.

---

[18]  The Court also noted that another appellate court in Florida had determined that the odor of marijuana on a person, by itself, justified searching the area from which the person had recently come. 904 So. 2d at 537-38.

[19]  The undersigned notes that in *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1075 n.47 (S.D. Tex. 2000), the Court relied on *Johnson v. United States*, 333 U.S. 10 (1948), to hold that the smell of burning narcotics did not "evidence an offense that is sufficiently grave to justify the entry and search of a private residence without a warrant."  In *Johnson*, the Supreme Court held that the entry into a hotel room was not justified based upon a tip that persons were smoking opium in the hotel room, combined with the detection, outside the room, of the odor of opium burning.  However, the holding in *Johnson* was limited to the lack of exigent circumstances, and the Court rejected the contention that odors alone were not sufficient to establish probable cause. In the case at bar the odor was not detected until the door was opened; at that point, exigent circumstances existed.  Moreover, the offense for which probable cause was established was drug trafficking rather than personal use.

4.  The Defendant voluntarily consented to have the police follow him inside the apartment while he retrieved his identification.

5.  Detective Cooper was lawfully inside the apartment based upon the consent of the Defendant when he smelled the odor of marijuana and observed crack cocaine in plain view on a table in the living room.

6. The tip, the odor of marijuana, and the discovery of crack cocaine in plain view established probable cause and exigent circumstances to secure the premises, and to arrest the Defendant.

7.  Even absent the consent of the Defendant, once the odor of marijuana was detected, there was probable cause to believe that drugs were present in the apartment; and, exigent circumstances justified the entry into the residence to secure the premises pending the issuance of a search warrant.

8.  There were no illegally obtained observations included within the search warrant affidavit.

9.  The entry, search, and seizure of evidence did not violate the Defendant's rights under the Fourth Amendment to the United States Constitution.

V.     CONCLUSION

Therefore, based upon a review of the record as a whole, and the above findings of fact and conclusions of law, it is hereby

RECOMMENDED that the Motion to Suppress be DENIED.

DONE AND SUBMITTED in chambers in Miami, Florida, on September 9, 2008.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to

whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).


**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies furnished to:**
**The Honorable Ursula Ungaro, United States District Judge**
**All counsel of record via CM/ECF**